UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| KIM JASINOWSKI, Special Administrator Of the Estate of Nicholas Grossi, Deceased, And NICHOLAS GROSSI, Deceased<br>       Plaintiffs,<br>v.<br><br>SHERIFF, COOK COUNTY,<br>MARK GANIER, Mental Health Senior,<br>JAMES GRAY, CMT, THE ISAAC<br>RAY CENTER, COOK COUNTY,<br>OFFICER BLYTH<br>and SERGEANT DOODY,<br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 08 C 5761<br>(Jury Demand)<br><br>Judge Castillo<br>Magistrate Judge Schenkier |

## SECOND AMENDED COMPLAINT

NOW COMES Plaintiff, KIM JASINOWSKI, Special Administrator of the Estate of Nicholas Grossi, Deceased and NICHOLAS GROSSI Deceased, by their attorney, Lonny Ben Ogus, and for their Amended Complaint states:

### Jurisdiction

1. This is a civil action seeking damages against the Defendants for committing acts, under color of law, that deprived the Plaintiff, KIM JASINOWSKI, Special Administrator of the Estate of Nicholas Grossi, Deceased AND NICHOLAS GROSSI Deceased, of rights secured under the Constitution and laws of the United States, and the Constitution and laws of the State of Illinois and for refusing and/or neglecting to prevent such deprivations and denials.

### The Parties

2. At all times relevant herein, KIM JASINOWSKI, Special Administrator of the Estate of Nicholas Grossi, Deceased and NICHOLAS GROSSI, Deceased were residents of Cook County, Illinois.

3. At all relevant times, COOK COUNTY was a body politic and corporate, situated in the Northern District of Illinois. At all relevant times, COOK COUNTY DEPARTMENT OF CORRECTIONS, CERMAK HEALTH SERVICES, and COOK COUNTY BUREAU OF HEALTH, SHERIFF of COOK COUNTY were departments of COOK COUNTY.

4. Defendants MARK GRANIER, and JAMES GRAY were employees of COOK COUNTY and acted under color of statutes, customs, ordinances and usage of the State of Illinois, and Cook County, and within the scope of their employment with the Defendant COOK COUNTY. All of the Defendants are sued in their individual capacity.

5. Defendants OFFICER BLYTH and SERGEANT DOODY were employees of SHERIFF, COOK COUNTY and under color of statutes, customs, ordinances and usage of the State of Illinois, and Cook County, and within the scope of their employment with the Defendant SHERIFF, COOK COUNTY. All Defendants are sued in their individual capacity.

6. Defendant THE ISAAC RAY CENTER is a private entity, located in the Northern District of Illinois.

7. Health care services at the Cook County Jail (CCJ) are provided by Cermak Health Service of Cook County (Cermak) which is part of the Cook County Bureau of Health.

8. All health service staff are county employees who are responsible for the heath care and security of all CCJ inmates, they are not employed by, or responsible to, the Cook County Sheriff or the Cook County Department Of Corrections (DOC).

9. Cook County and Cook County Sheriff's Office are responsible for the well-being of CCJ inmates, including providing adequate care for inmate's medical and mental health care needs.

10. Mental health services at CCJ are provided through a combination of County Cermak employees and a contract with the Isaac Ray Center (IRC) for psychiatric services.

11. Other unknown Defendants were responsible for the mental health, physical health, medication, and safety of Grossi.

### Statement of Facts Common to All Counts

12. On December 27, 2007, Grossi was sentenced to 28 days of imprisonment by the Criminal Division of Circuit Court of Cook County, Illinois, and he was remanded to the custody of the Cook County Department of Corrections to serve that sentence. Grossi would be given reductions of the amount of time that he would have to serve so that the real time to be served was about 14 days.

13. At the time of his sentencing Grossi was taking certain medications that had been prescribed by a licensed physician for certain medical conditions that were mental in nature.

14. Pursuant to the custom and policy of the Defendants, Grossi was not permitted to retain custody of his medications and they were taken from him.

15. Pursuant to the custom and policy of the Defendants, on about December 27, 2007, Grossi underwent medical and psychological tests to determine his placement within the Defendants, which included determining his medical and psychiatric conditions to determine the level of care and observation that were required to maintain his safety and health.

16. Pursuant to the custom and policy of the Defendants, on December 27, 2007, Grossi underwent medical and psychological tests to determine what medicines he should

receive, from the supplies of the DOC, to maintain his safety and health. Defendant Ganier was the Mental Health Senior that conducted the psychological screening evaluation. Defendant Gray was the CMT that conducted the medical intake evaluation.

17. Defendant Blyth and Doody were the DOC officers assigned to watch and supervise the watching of the tier where Grossi was located.

18. After having his medication taken away, pursuant to custom and policy, no similar medication was given to Grossi while he was incarcerated.

19. On about December 31, 2008, information was provided to the DOC that Grossi was without medication, that he needed such, and that he sounded strange on the telephone. DOC stated that this information would be processed to determine what should be done.

20. On January 1, 2008 GROSSI was serving his sentence at the Cook County Department of Corrections ("DOC"), 2600 S. California, Chicago, Illinois at Division V, a medium-security male division.

21. On January 1, GROSSI died while in the custody of the Cook County Department of Corrections after he hung himself with a sheet, taken from his cell/bedding that had one end around his neck and the other end around the top bunk bed.

22. While in his cell GROSSI could not be seen or properly protected by the persons and entities responsible for watching his tier and cell from the location they were watching. Defendants Blyth and Doody were those responsible for the tier and cell and the safety of Grossi.

23. While in his cell GROSSI could not be seen or properly protected by the persons and entities responsible for watching his tier and cell from the location they were watching because

those persons were responsible for the safety of too many tiers and cells, a policy known as "cross-tiers," pursuant to the custom and policy of the Defendants.

24. After GROSSI was discovered hanging from the sheet in his cell, it took six (6) minutes to get him down because those that responded could not lift him up and, pursuant to custom and policy, were provided no method, for quickly undoing the knot that had been made that was used to cause the hanging. During that period of time, while alive, Grossi suffered great pain, anxiety, and suffering.

25. Within the first four (4) months of 2008, two (2) other inmates were able to commit suicide in the Cook County Jail.

26. Defendants failed to engage in consistent and effective quality assurance reviews that are needed to monitor and assess the quality of care and protection offered.

27. Defendants fail to provide inmates with adequate mental health care and additionally fail to address the specific needs of inmates with mental illness including but not limited to: (a) failure to timely and properly evaluate inmates for treatment; (b) inadequate assessment and treatment; (c) inadequate psychotherapeutic medication administration and (d) inadequate suicide prevention.

28. The Defendants failed to provide an adequate number of trained staff to provide adequate programming and coverage in the mental health areas.

29. Defendants fail to properly identify inmates with mental illness or significant psychological issues through adequate screening, which is essential to providing appropriate mental health care, and to reduce potential harm to those whose conditions would otherwise go unrecognized.

30. Defendants' medical screening and follow-up care procedures deny necessary care to inmates in that insufficiently trained persons perform mental health initial intake screening, and it is not done under appropriate medical supervision, allowing inadequately or inappropriately trained persons to query inmates regarding their mental health history.

31. For mental health screening, CCJ uses a "Department of Mental Health Service Brief Primary Psychological Screening Tool" which is not incorporated into the medical record. This one-page form only collects brief demographic information and answers to 11 general questions. No mental status exam is done at that time. A decision is then made as to place the inmate in general population or refer the inmate for admission to psychiatric services, or to conduct a second interview. No question not on the form is asked, and there is insufficient training and understanding as to when additional questions should be asked or what those additional questions should be in relation to the assessment of suicide risk. Mental health symptomatology that is associated with current treatment or suicidal ideation is unlikely to be uncovered.

32. CCJ fails to timely and appropriately evaluate inmates for the administration of psychotropic medications and to monitor their continued administration.

33. Many inmates require psychotropic medication to avoid acute and chronic episodes of mental illness.

34. CCJ fails to properly and adequately provide a physician to see an inmate who is in need of psychotropic medication.

35. CCJ causes delays for inmates in having their psychotropic mediations started after their admission to CCJ.

36. CCJ causes inmates to routinely not receive medications as prescribed.

37. Medication administration problems are made worse because psychiatrists do not utilize sufficient and appropriate guidelines or protocols as to the psychiatric care being provided at CCJ.  No routine lab work, weights, measurements or screenings are conducted regardless of the medication being prescribed in violation of generally accepted professional standards.  CCJ provides medication management that significantly departs from generally accepted professional standards.

38. Suicide prevention practices at CCJ are grossly inadequate and do not comport with generally accepted professional standards of correctional mental health care.

39. CCJ policy on suicide prevention fails to ensure appropriate management of suicidal inmates and lack an adequate suicide prevention program.

40. The appropriate observation of inmates in hindered by physical limitations of the rooms in which they are placed because observation rooms have blind spots and windows that are too high for routine viewing, and many rooms contain numerous other risk factors, like exposed plumbing and electrical hazards.

41. Contrary to generally accepted correctional practices, CCJ officers and staff have no access to cut-down tools for quick response in the event of a suicide attempt.

42. In each of the three (3) suicides in 2008, there was a delay between discovery of the inmate hanging and the removal of the noose.

43. Suicide prevention is not under the direction and supervision of mental health staff.

44. Annual training for staff regarding suicide prevention is not required.

45. Contrary to generally accepted practice, there is no adequate clinical administrative review by mental health staff following a suicide or a suicide attempt to identify and correct what could have been done to prevent the act.

46. On July 27, 2006, an inmate hung himself, to death, after being in CCJ for about one week. The inmate provided a history of suicide attempts but denied current suicidal ideation. No secondary medical health evaluation was conducted and no additional mental health assessment was given prior to his death.

47. On July 25, 2006, an inmate hung himself in his cell, two days after arriving at CCJ. His past history was three (3) prior psychiatric hospitalizations, including a suicide attempt. No secondary mental health evaluation was conducted nor did he receive additional mental health assessments after intake.

48. CCJ provides an insufficient number of appropriately trained mental health and custody staff to provide adequate mental health services.

49. CCJ entered into a consent decree as to mental health care (*Harrington v. DeVito*, No. 74-C-3290, N.D. Ill. Oct. 19, 1978). In 1998 and 2002 the Court Monitor for Mental Health found that a shortage of adequately trained nurses, mental health specialists, psychiatrists and psychologists caused "significant access barriers to care and adequate therapeutic programming resources" and that a lack of adequate numbers of record technicians resulted in incomplete records, and a lack of availability of records during clinical assessments.

50. All of the Defendants, and other unknown defendants, including but not limited to agents and employees of the named Defendants, were responsible for the mental health, physical health, medication, and safety of Grossi and wrongfully acted which also directly caused the death of Grossi.

51. Plaintiff demands a trial by jury.

## COUNT I
(SECTION 1983 CIVIL RIGHTS VIOLATION)

52. Plaintiff repeats and realleges paragraphs 1-51 as of fully set forth herein.

WHEREFORE, Plaintiffs demand judgment in excess of Fifty Thousand Dollars ($50,000) in compensatory damages against all of the Defendants, jointly and severally, and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000) against each of the Defendants, plus costs, attorneys' fees, and whatever additional relief this Court deems just and equitable.

## COUNT II
(SECTION 1983 CIVIL RIGHTS VIOLATION-FOURTEENTH AMENDMENT)

53. Plaintiff repeats and realleges paragraphs 1-50 as of fully set forth herein.

WHEREFORE, Plaintiffs demand judgment in excess of Fifty Thousand Dollars ($50,000) in compensatory damages against all of the Defendants, jointly and severally, and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000) against each of the Defendants, plus costs, attorneys' fees, and whatever additional relief this Court deems just and equitable.

## Count III
(Wrongful Death)

54. Plaintiff repeats and realleges paragraphs Nos. 1-51 as fully set forth herein.

WHEREFORE, Plaintiffs demand judgment in excess of Fifty Thousand Dollars ($50,000) in compensatory damages against all of the Defendants, jointly and severally, and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000) against each of the Defendants, plus costs, attorneys' fees, and whatever additional relief this Court deems just and equitable.

## COUNT IV
(Negligence)

55. Plaintiff repeats and realleges paragraphs Nos. 1-51 as fully set forth herein.

WHEREFORE, Plaintiffs demand judgment in excess of Fifty Thousand Dollars ($50,000) in compensatory damages against all of the Defendants, jointly and severally, and punitive damages

in an amount in excess of Fifty Thousand Dollars ($50,000) against each of the Defendants, plus costs, attorneys' fees, and whatever additional relief this Court deems just and equitable.

## COUNT V
### (Intentional Infliction of Emotional Distress

56. Plaintiff repeats and realleges paragraphs Nos. 1-51 as fully set forth herein.

WHEREFORE, Plaintiffs demand judgment in excess of Fifty Thousand Dollars ($50,000) in compensatory damages against all of the Defendants, jointly and severally, and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000) against each of the Defendants, plus costs, attorneys' fees, and whatever additional relief this Court deems just and equitable.

_____
Attorney for Plaintiffs

Lonny Ben Ogus
39 S. LaSalle St.
Suite 1400
Chicago, Ill. 60603
(312) 332-7374